**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ESTATE OF TYLER TABOR;
RAY TABOR, as personal representative of the estate of TYLER TABOR, deceased;
MICHELLE MCLEAN, as legal guardian for minor child D.T.;
D.T., a minor child by and through his legal guardians; and
BRIDGET TABOR,

      Plaintiffs,

v.

ADAMS COUNTY, COLORADO; a government entity;
CORIZON HEALTH, INC.;
SHERIFF MICHAEL MCINTOSH, in his official and individual capacity;
BENJAMIN CLOWER, in his individual capacity;
STACI GORDON, in her individual capacity;
STEPHANIE OSTROM, in her individual capacity;
CHERYL GROOTHUIS, in her individual capacity;
KAREN STURGEON, in her individual capacity;
MYKELANN WISE, in his individual capacity;
MICHAEL BROWN, in his individual capacity;
CORY ENGEL, in his individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiffs, by and through their attorneys, David A. Lane, Darold Killmer, and Andy McNulty of KILLMER, LANE & NEWMAN, LLP, hereby bring this Complaint and allege as follows:

**INTRODUCTION**

      1.      The administration of a simple infusion of intravenous fluids, a regularly prescribed and effective medical treatment for dehydration, a treatment that any basically-trained

1

doctor or nurse would administer in the face of manifest extreme dehydration.

2. An IV was the life-saving, necessary medical treatment that officials at Adams County and medical staff employed by Corizon denied Tyler Tabor as he lay crumpled in a cell at the Adams County Detention Facility, agonizingly suffering the effects of dehydration and withdrawal from both opiates and benzodiazepines. Their refusal would cause Tyler's death.

3. Tyler was booked into Adams County Detention Facility on a misdemeanor warrant. Upon intake, he told medical staff that he was addicted to opiates and had used them previously that day; he also told the nurse that he had been prescribed, and was taking, Xanax, a benzodiazepine. His withdrawal symptoms began immediately.

4. As Tyler's condition progressed from bad to worse, Corizon medical staff watched and Adams County officials stood by, content to watch Tyler suffer. Throughout his incarceration at Adams County Detention Facility, and even after his death, Tyler would never see a doctor. Inexplicably, Tyler would never receive his prescribed Xanax or treatment to combat withdrawal from benzodiazepines. While attempting to take his pills during medication rounds, Tyler fell to the ground, unable to stand on his own. He was so dehydrated, that his hands were clenched into unusable claws, rendering him powerless to hold that medication. A Corizon nurse had to place the medication into Tyler's mouth for him, while an Adams County deputy held Tyler to steady him from falling over.

5. Ultimately, Tyler begged for an IV. A Corizon nurse told him that IVs were only given when it was "absolutely necessary."

6. Tyler died at 6:00 a.m. on May 17, 2016, less than six hours after he begged for an IV and only a few hours after he pressed the distress button in his cell. Tyler's death was caused by dehydration. Tyler's death was easily and completely preventable.

7.      The actions of the Corizon nurses and doctor in the death of Tyler should be unsurprising by now. Deliberate indifference in the face of serious medical conditions is company policy at Corizon, where profits take precedence over basic medical care. Inhumanity is Corizon's standard operating procedure. Knowing this, Adams County still elected to contract medical services at Adams County Detention Facility to Corizon.

8.      Tyler's parents could have easily paid Tyler's $300 bond, but they had an agreement with Tyler that he should go to jail, take care of his warrant, and get clean. Like so many other American families, they believed that jail was a safe place for their son to kick his opiate addiction. Instead, their son died. The Tabor family will never be whole again.

## JURISDICTION AND VENUE

9.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

10.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

11.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this litigation.

## PARTIES

**Plaintiffs**:

12.     At all times pertinent hereto, the decedent, Tyler Tabor, was a citizen of the United States of America and a resident of the State of Colorado confined to the Adams County Detention Facility.

13.    At all times pertinent hereto, Ray Tabor, personal representative to the Estate of Tyler Tabor, has been a citizen of the United States of America and a resident of the State of Colorado. Ray Tabor is Tyler's father.

14.    At all times pertinent hereto, Michelle McLean has been a citizen of the United States of America and a resident of the State of Colorado. Michelle McLean is legal guardian for Tyler's six-year-old son, D.T., and Tyler's mother.

15.    At all times pertinent hereto, D.T. has been a citizen of the United States of America and a resident of the State of Colorado. D.T. is Tyler's six-year-old son.

16.    At all times pertinent hereto, Bridget Tabor has been a citizen of the United States of America and a resident of the State of Colorado. Bridget Tabor is Tyler's wife.

**Defendants**:

***Adams County***

17.    Defendant Adams County, Colorado ("Adams County") is a political subdivision of the State of Colorado and is the public entity responsible for Adams County and the Adams County Detention Facility ("ACDF"). ACDF is operated by the Adams County Sheriff's Department.

18.    At all times relevant to the subject matter of this litigation, Defendant Michael McIntosh was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant McIntosh was acting under color of state law in his capacity as the Adams County Sheriff. Defendant McIntosh was responsible for training and supervising all other Defendants and other employees of the Adams County Sheriff's Department working at ACDF, for setting jail policy for the county and the overall management of ACDF, and for insuring the health and welfare of all persons detained in ACDF.

19.     Defendant Adams County and Defendant McIntosh, in his official capacity, are collectively referred to as "Adams County Defendants."

20.     At all times relevant to the subject matter of this litigation, Defendant Mykelann Wise was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Wise was acting under color of state law in his capacity as a Sergeant employed by the Adams County Sheriff's Office.

21.     At all times relevant to the subject matter of this litigation, Defendant Michael Brown was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Brown was acting under color of state law in his capacity as a Deputy Sheriff employed by the Adams County Sheriff's Office.

22.     At all times relevant to the subject matter of this litigation, Defendant Cory Engel was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Engel was acting under color of state law in his capacity as a Deputy Sheriff employed by the Adams County Sheriff's Office.

*Corizon*

23.     Defendant Corizon Health, Inc. ("Corizon"), formerly Corizon Medical Services, Inc., is a for-profit Tennessee corporation doing business in the State of Colorado, with its principal street address located at 105 Westpark Drive, Suite 200, Brentwood, TN 37207. Corizon performs the typically governmental function of assuming responsibility for inmate health care. Corizon contracts with Adams County to provide medical services to inmates and detainees at ACDF and supervises and implements such care.

24.     Corizon is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, training, and supervision of staff,

including individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

25.     At all relevant times, Corizon was acting under color of state law and performing a central function of the state, thus making them liable under § 1983.  The conduct of Corizon and its employees and agents, is chargeable to the government, and Corizon was acting jointly with the government actors.

26.     At all times relevant to the subject matter of this litigation, Defendant Benjamin Clower was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Clower was acting under color of state law in his capacity as a Medical Doctor employed by Corizon.

27.     At all times relevant to the subject matter of this litigation, Defendant Staci Gordon was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Gordon was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

28.     At all times relevant to the subject matter of this litigation, Defendant Stephanie Ostrom was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Ostrom was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

29.     At all times relevant to the subject matter of this litigation, Defendant Cheryl Groothuis was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Groothuis was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

30.     At all times relevant to the subject matter of this litigation, Defendant Karen

Sturgeon was a citizen of the United States and a resident of Colorado. At all relevant times, Defendant Sturgeon was acting under color of state law in her capacity as a Registered Nurse employed by Corizon.

## FACTUAL ALLEGATIONS

### *Tyler Tabor was surrounded by a loving, close-knit family who cared about him deeply.*

31.     Tyler Tabor was born to Ray Tabor and Michelle McLean on March 8, 1990; he was their first born.

32.     Ray and Michelle describe Tyler as the type of child who could walk up to anyone and instantly become friends with them.

33.     He had a close bond with both of his parents. When Tyler was in elementary school he idolized his father so much that he asked his teacher to change his name to Ray, so that he could be more like his father.



*Tyler, as a young child, with his father, Ray.*

34.     As her first born, Michelle adored Tyler.



*Tyler with his mother, Michele McLean.*

35.    Tyler also had a strong emotional bond with his siblings, Brandon and Kyla.

Brandon was one of Tyler's best friends. Growing up, Brandon was like a shadow to Tyler;

everything Tyler would do, Brandon would mimic. Tyler was a role model for his brother. Kyla

Tabor, his sister, saw Tyler as a caretaker, someone who always ensured her safety, and she

cared for him dearly.



*Jason McLean, Michele McLean, Brandon Tabor, Kayla Tabor, Ray Tabor,*
*Kristy Tabor, and D.T. (from left to right), celebrating Tyler's life.*

36.    Six years ago, Tyler's biological son, D.T., was born. D.T., like Tyler had before

him with Ray, idolized his father. D.T. and his father would frequently go fishing together and

ride BMX bicycles. D.T. was five years old when his father died. Now, every time the family gathers for events, D.T. asks Ray and Michelle why his daddy isn't there.

 

*Tyler with his son D.T.*

37.     Tyler was married. He met Bridget Tabor while working for Steel Star Corporation in 2011; she was a painter and he was a welder. Within two weeks of meeting one another, they were a couple. They married within eight months, in April 2012. Bridget says she knew right away that she was in love with Tyler and that he was the one for the rest of her life. Bridget and Tyler lived together for the next three years. During their time together, Tyler became a father figure to Bridget's two daughters, Haylie Tabor and Maddie Buesgens-Wright. Bridget describes Tyler as the "love of her life" to this day and will never truly get over his death.

**_Tyler's arrest on May 14, 2015 and incarceration at ACDF._**

38.     On May 14, 2015, Tyler was arrested by a Thornton police officer on two outstanding warrants in Larimer County for failure to comply with probation conditions in connection with a misdemeanor harassment conviction and failure to appear on a misdemeanor charge of driving under restraint.

9

39.     At approximately 3:07 p.m. on May 14, 2015, Tyler arrived at ACDF for booking and processing.

***Tyler put Corizon medical staff and ACDF officials on notice that he had serious medical needs.***

40.     During the standard medical screen performed during the booking process, Tyler informed Nurse Karen Sturgeon that he was a daily heroin user and had used heroin previously that day.

41.     Tyler also informed Nurse Sturgeon that he had been prescribed Xanax, at 2 mg per day, and that he had taken Xanax daily up until his arrest.

42.     Nurse Sturgeon indicated on his intake form that Tyler was a heroin user on Tyler's medical intake screening form.

43.     Nurse Sturgeon indicated on his intake form that Tyler had been prescribed a 2 mg daily dose of Xanax by his physician. She confirmed with Tyler's pharmacy, Berthoud Family Drug, the dosage of Xanax Tyler had indicated that he was prescribed and had taken was correct.

44.     Per standard procedure at ACDF and Corizon, Tyler was placed on an opiate withdrawal protocol and a benzodiazepine withdrawal protocol.

45.     In accordance with the opiate withdrawal protocol, Tyler was prescribed Clonidine, Hydroxyzine, Acetaminophen, Pepto Bismal, Loperamide, and Promethazine. He was also prescribed Buprenorphine, a necessary treatment for withdrawal from opiates, but was never provided with Buprenorphine.

46.     Corizon, through the actions of Dr. Clower and Nurse Sturgeon, failed to prescribe any medication to treat Tyler's withdrawal from benzodiazepines.

47.     Throughout Tyler's incarceration at ACDF, he would not receive prescription treatment for withdrawal from benzodiazepine or the appropriate amount of Xanax, 2 mg, as prescribed to him by his primary care physician.

48.     Nurse Sturgeon did nothing to ensure that Tyler was given his prescribed Xanax or treatment for benzodiazepine withdrawal, even after confirming that he had a valid prescription for Xanax.

49.     At approximately 6:30 p.m. on May 14, 2015, Tyler completed the intake process and was housed in the medical unit. Tyler was placed in the medical unit so that he ostensibly could receive treatment in accordance with Corizon's opiate withdrawal protocol.

***Tyler immediately began experiencing symptoms of severe opiate withdrawal, benzodiazepine withdrawal, and dehydration.***

50.     Beginning at approximately 5:11 a.m. on May 15, 2015, Tyler experienced symptoms of severe opiate withdrawal.

51.     During rounds at 5:11 a.m. on May 15, 2015, Nurse Staci Gordon checked Tyler's vital signs. Tyler reported to Nurse Gordon that he was experiencing nausea and consistent vomiting.

52.     At approximately 11:02 a.m. on May 15, 2015, Tyler reported to Nurse Stephanie Ostrom that he was experiencing nausea, vomiting, and diarrhea and was restless, agitated, and anxious. Nurse Ostrom noted that Tyler was extremely restless during her consultation with him.

53.     Nurse Gordon again checked Tyler's vital signs at 2:29 a.m. on May 16, 2015. During this consultation, Nurse Gordon noted that Tyler was experiencing vomiting and because of the vomiting, was not able to eat or drink much.

54.     Later, at approximately 9:17 a.m. on May 16, 2015, Nurse Stephanie Ostrom checked Tyler's vital signs. She noted that Tyler continued to experience nausea, vomiting, and

diarrhea and that he felt weak. Nurse Ostrom gave Tyler a cup of Gatorade and sent him back into his cell.

55.     During a consultation at 11:10 a.m. on May 16, 2015, Nurse Stephanie Ostrom noted that Tyler was experiencing nausea, vomiting, and diarrhea. Nurse Ostrom also noted that Tyler had been attempting to eat and drink, but was unable to keep any fluids or food down because of his constant vomiting. During this consultation, Tyler was so dehydrated that he was unable to urinate to provide a sample for Nurse Ostrom. Nurse Ostrom noted that Tyler appeared fatigued, was suffering from tremors, and had low blood pressure. In a callous response to the clear dehydration Tyler was experiencing and the obvious medical need for intravenous fluids, Nurse Ostrom's only advice to Tyler was to try to eat crackers at this time.  She left Tyler's cell without providing Tyler with any further care.

56.     Because of Tyler's condition during the consultation at 11:10 a.m. on May 16, 2015, Nurse Ostrom spoke with the supervising doctor, Dr. Benjamin Clower, to consult about further treatment. Dr. Clower told Nurse Ostrom to simply continue monitoring Tyler and did not advise any further treatment. Dr. Clower did not examine Tyler personally and, in fact, never examined Tyler in person during the entirety of Tyler's incarceration at ACDF.

57.     Throughout the day on May 15, 2015 and May 16, 2015, Tyler continued to vomit and was unable to stomach food or fluids. He reported to multiple nurses, including Nurses Gordon, Groothuis, and Ostrom, that he was nauseous, vomited regularly, felt weak, and was unable to eat or drink without vomiting.

58.     The Deputies and Sheriffs on duty, including Michael Brown and Corey Engel, witnessed Tyler consistently vomiting and experiencing diarrhea. These officials also saw

Tyler's general restlessness and weakness, which are obvious signs of dehydration, severe opiate withdrawal and severe benzodiazepine withdrawal.

### *Tyler exhibited obvious outward signs of his rapidly deteriorating medical condition.*

59.    At approximately 7:55 p.m. on May 16, 2015, Nurse Cheryl Groothuis, along with Deputy Michael Brown, came to Tyler's cell to check his vital signs. During Nurse Groothius' consultation, Tyler staggered to the door and was visibly unable to stand without assistance. Despite Tyler's visible signs of physical distress, Nurse Groothius simply took his vital signs and left Tyler. Deputy Brown did not take any further action to assist Tyler, despite his obvious medical needs.

60.    After being seen by Nurse Groothuis at 7:55 p.m., Tyler was unable to stand up and walk back to his bed. Instead, he crawled along the floor so that he could lie down in his bed. A short while later, Tyler attempted to stand up and was unable to, falling over his cellmate's bed and landing on the floor. This was all captured on the security video feed of Tyler's cell and seen by the deputy charged with monitoring that feed. After falling to the floor, Tyler sat against the wall for a while before staggering to the toilet. He sat on the toilet for a considerable amount of time, experiencing diarrhea, before going back to his bed to attempt to sleep.

61.    At approximately 11:38 p.m. on May 16, 2015, Tyler was called for another round of medication. Tyler was unable to stand on his own and was helped to his feet by his cellmate. Tyler eventually staggered to the door, where he was greeted by Nurse Groothuis and Deputy Brown. Nurse Groothuis handed Tyler his medications, but Tyler's hands were cramping so badly that he was unable to hold them and they fell to the floor.

62.    Deputy Brown was forced to assist Tyler in taking his medication and had to steady Tyler as he was unable to stand on his own. Nurse Groothuis eventually helped Tyler take

his medication by placing it into his mouth for him because Tyler's hands were so cramped that he could not hold the pills. As Tyler was stepping away from Nurse Groothuis after taking his medication, he lost his balance and almost fell to the ground, but Deputy Brown caught him. Tyler was then helped to the ground and both Nurse Groothuis and Deputy Brown left his cell.

63.     After the 11:38 p.m. medication round, Nurse Groothuis returned to Tyler's cell and brought Tyler to the treatment area of the medical unit to check his vitals. While back in the treatment area, Tyler begged Nurse Groothuis to provide him with intravenous fluids.

64.     Tyler knew that he needed intravenous fluids because he had gone through withdrawal before, but at a detox center. When Tyler was at the detox center, staff there told him that because his withdrawal was high-risk (because it was complicated by the effects of withdrawal from benzodiazepines), he would always need an IV when going through withdrawal.

65.     Instead of providing Tyler with an IV, Nurse Groothuis told him that it was Corizon's and Adams County's policy to not provide intravenous fluids unless it was "absolutely necessary."

66.     In the midst of checking Tyler's vital signs after the 11:38 p.m. medication round on May 16, 2015, Nurse Groothuis witnessed Tyler experience a violent muscle spasm that caused both his hands and wrists to contract. Nurse Groothuis noted that she had *never* seen this reaction from a withdrawing patient. Nurse Groothuis provided Tyler with two pitchers of Gatorade (each pitcher containing approximately one liter of fluid) and monitored his blood pressure readings after each pitcher. Even though Tyler's blood pressure readings did not significantly change, Nurse Groothuis sent Tyler back to his cell without providing further care.

14

67.     Nurse Groothuis observed all of these troubling signs of Tyler's worsening withdrawal and dehydration, yet the only medical treatment she provided him was more Gatorade.

68.     Nurse Groothuis called Dr. Clower and reported everything she had seen, including that she had seen Tyler's hands violently spasm. Despite this information, Dr. Clower did not prescribe further treatment and did not even bother to personally examine Tyler. Dr. Clower's only instruction to Nurse Groothuis was to continue to monitor Tyler.

69.     On May 16, 2015, Tyler's blood pressure went from 110/71 at 2:29 a.m. to 83/60 at 11:38 p.m. The severe drop in Tyler's blood pressure is what prompted Nurse Groothuis to provide Tyler with two liters of Gatorade. Even after drinking two pitchers of Gatorade, Tyler's blood pressure was still dangerously fluctuating.

***Despite the clear, obvious signs that Tyler was suffering from life-threatening dehydration and severe opiate and benzodiazepine withdrawal, Adams County officials and Corizon medical staff willfully and wantonly ignored Tyler until he died on May 17, 2015.***

70.     The next time anyone returned to Tyler's cell was approximately 2:20 a.m. on May 17, 2015, when Tyler was taken, in a wheelchair, to see Nurse Groothuis by Deputy Engel. Tyler could not walk to the treatment area because he was so weak from dehydration.

71.     Nurse Groothuis took his vital signs and his blood pressure. After a few minutes of assessment, Tyler was returned to his cell. Despite Tyler's manifest outward signs of dehydration and severe withdrawal, including the inability to walk to the treatment area under his own power, no one would take Tyler's vital signs again. Tyler would die approximately four hours later.

72.     At approximately 4:10 a.m. on May 17, 2015, Nurse Groothuis and Deputy Brown visited Tyler's cell to administer medication. Tyler had difficulty standing and fell

multiple times in Nurse Groothuis's and Deputy Brown's presence. Nurse Groothuis handed

Tyler his medications, but again his hands were so cramped that he could not hold them. As

Tyler let go of the wall he was holding on to for balance to retrieve the dropped medication, he

fell to the floor. Nurse Groothuis attempted to help Tyler to his feet, but was unable to do so.

Deputy Brown entered the cell and helped Tyler into his bed, where Nurse Groothuis gave Tyler

the medication he had dropped. Nurse Groothuis did not provide any further treatment or check

Tyler's vitals. She left the cell.

73.     Upon information and belief, Sergeant Mykelann Wise, as shift supervisor, knew,

or should have known, about Tyler's deteriorating condition. Deputies Brown and Engel reported

to Sergeant Wise the tell-tale signs of severe dehydration and withdrawal that Tyler was

experiencing. Sergeant Wise was the on-scene supervisor for ACDF's medical cells on the

morning of May 17, 2015.

74.     At approximately 4:20 a.m. on May 17, 2015, breakfast was delivered to Tyler's

cell by Deputy Brown, but Tyler was too weak to get out of bed to accept it at his cell door.

Instead, Deputy Brown placed the breakfast next to Tyler's bed. Deputy Brown observed that

Tyler barely touched this meal. Deputy Brown did nothing to help Tyler's dire condition.

75.     At approximately 4:50 a.m. on May 17, 2015, Tyler pressed his cell's distress

button. Nurse Gordon responded but Tyler was incoherent as he spoke over the intercom. Nurse

Gordon visited Tyler's cell, spoke with him very briefly, and then left his cell. Nurse Gordon did

not administer any treatment to Tyler during this visit or check his vital signs. A few minutes

after Nurse Gordon left Tyler's cell, he got out of bed and staggered towards the cell door. After

a minute of looking out the cell door window, he lost his balance and fell. After lying on the

floor briefly, he crawled back into his bed.

76.     Tyler's distressed call for help at 4:50 a.m. was essentially ignored by Nurse Gordon.

77.     ACDF Deputies failed to perform the scheduled 5:00 a.m. row check. At 5:00 a.m. Tyler was one hour from death resulting from dehydration.

78.     Throughout the morning of May 17, 2015, Deputy Engel was in the main control room, assigned to monitor security cameras that had a live video feed of Tyler's cell. Deputy Engel had a live view of everything that was happening in Tyler's cell and, upon information and belief, observed Tyler's visible signs of distress throughout the morning of May 17, 2015.

79.     At approximately 5:20 a.m. on May 17, 2015, Tyler crawled to the cell door. While near the cell door, he vomited onto the floor. Tyler subsequently passed out in the middle of the cell, on his back.

80.     Over five minutes later, at approximately 5:25 a.m., Deputy Engel went to check on Tyler because he saw him lying in the middle of his cell on the video monitors in the main control room at ACDF. When Deputy Engel entered the cell, he noticed that Tyler had a grey color to him and was having difficulty breathing. Deputy Engel attempted to speak to Tyler and kicked Tyler a few times, but Tyler could only moan in response.

81.     Instead of immediately calling for medical personnel or emergency medical services, Deputy Engel called other correctional deputies to assist him.

82.     Deputy Brown was the first to arrive to assist Deputy Engel. He shined a flashlight into Tyler's eyes, but Tyler did not respond.

83.     Sergeant Wise arrived after Deputy Brown, and only then were medical personnel called.

84.     It was several minutes before Nurse Groothuis arrived. She gave Tyler a sternum rub and attempted to speak with him. Tyler was incoherent.

85.     Nurse Groothuis then left Tyler, alone without any medical personnel, and went to call Dr. Clower. Because Nurse Groothuis left to call Dr. Clower, Tyler again was left without medical assistance for several minutes.

86.     Nurse Groothuis was unable to get in touch with Dr. Clower and left him a message.

87.     Sergeant Wise, Deputy Engel, and Deputy Brown placed Tyler into a wheelchair and moved him to the treatment area. During this entire time, Tyler was unresponsive. Upon arrival in the treatment area, Tyler appeared to have a seizure where his body spasmed and then became limp.

88.     Shortly before his seizure, Nurse Derald Lara arrived in the treatment area. After this seizure subsided, Tyler was moved to the floor and Nurse Lara gave him a sternum rub.

89.     Only after administering the sternum rub did Nurse Lara notice that Tyler was not breathing and began CPR.

90.     While Nurse Lara was performing CPR, Nurse Groothuis returned. She had been gone for over ten minutes, leaving Tyler without medical assistance for a large portion of that time.

91.     By the time an AED was placed on Tyler, he was not breathing and had no pulse.

92.     At 5:44 a.m., EMS personnel arrived and began treatment.

93.     Tyler was pronounced dead a short while later, at 6:00 a.m. on May 17, 2015.

94.     Less than six hours from the point at which Tyler begged Nurse Groothuis for intravenous fluids, Tyler was dead from dehydration.  A simple IV would have almost certainly have saved his life.

***It was obvious even to Tyler's cellmates that Tyler was suffering the effects of life-threatening dehydration and opiate withdrawal.***

95.     Tyler's cellmates stated that Tyler was acting strange and incoherent throughout his stay at ACDF and particularly on May 16, 2015.

96.     One of Tyler's cellmates, Rocco Chioda, stated that Tyler could not eat the food and drink the fluids that were provided to him by jail staff because his withdrawal symptoms were so severe and that ACDF and Corizon staff observed Tyler's failure to be able to eat and drink throughout Tyler's incarceration.

97.     Mr. Chioda noted that Tyler told him that his withdrawal was so severe that he could not sleep.

98.     Mr. Chioda also reported that Tyler was making nonsensical statements and that Tyler was delusional on May 16, 2015.

99.     Robert Allen, Tyler's other cellmate, observed Tyler consistently tell the nursing staff that he was "not okay."

100.     Mr. Allen reported that Tyler was consistently too weak to stand on his own and had trouble keeping fluids down. Mr. Allen also reported that Tyler appeared lethargic when he spoke to nurses.

101.     Mr. Allen corroborated Tyler's inability, due to his severe dehydration and hand cramping, to hold the medication he was given. Mr. Allen reported that Tyler's hand cramping was so severe that his hands were constantly curled in. Mr. Allen noted that the nurses were forced to give Tyler his medication orally because of this.

*__Opioid withdrawal and benzodiazepine withdrawal are serious medical conditions.__*

102.    Detoxing from opiates and benzodiazepine is a dangerous process that requires significant physician oversight.

103.    The National Commission on Correctional Health Care ("NCCHC") states that those withdrawing from opiates in correctional settings can be grouped into four categories: (1) low risk, asymptomatic; (2) low risk, symptomatic; (3) high risk; and (4) pregnant.

104.    According to the NCCHC, individuals who are experiencing opiate withdrawal complicated by sedative withdrawal, including benzodiazepine withdrawal, are considered high risk.

105.    The NCCHC clinical guidelines mandate that high risk patients should be given intensive monitoring and treatment and should be transferred to a facility equipped to manage emergencies.

*__Deficiencies in the care and training provided by Corizon and Adams County personnel__*

106.    As a high-risk patient suffering from withdrawal, pursuant to the NCCHC clinical guideline, Tyler should have been immediately taken to an acute care facility, hospital, or a facility equipped to manage emergencies for the duration of his withdrawal.

107.    Not only was Tyler never taken to an acute care facility, hospital, or a facility equipped to manage emergencies during his withdrawal, he never once saw Dr. Benjamin Clower, the physician who was charged with monitoring and ostensibly treating him throughout his incarceration at ACDF.

108.    Corizon medical staff and ACDF officials did not taper Tyler off of benzodiazepines. Instead, his benzodiazepine usage was abruptly ended immediately upon

intake. According to NCCHC, this is the most dangerous way to detoxify from benzodiazepines and is not the recommended course of treatment for withdrawing from benzodiazepines.

109.     Tyler was never prescribed medication aimed at helping with benzodiazepine withdrawal, such as Buspirone or Flumazenil, throughout his incarceration at ACDF. Tyler was inexplicably taken off of Xanax, without a contingency plan, alternative course of treatment, or adequate medical supervision.

110.     Tyler, upon intake, was prescribed Clonidine, Hydroxyzine, Acetaminophen, Pepto Bismal, Loperamide, and Promethazine. He was also prescribed Buprenorphine. He was not provided with Buprenorphine throughout his incarceration at ACDF.

111.     For inmates that are experiencing opiate withdrawal, the NCCHC mandates that either Methadone or Buprenorphine be provided. The NCCHC notes that administering Buprenorphine is important because it is a mixed agonist-antagonist; its use can precipitate acute withdrawal if given before a person develops significant withdrawal symptoms.

112.     While Tyler was prescribed buprenorphine, he was provided with neither Buprenorphine nor Methadone. Simply providing Tyler with one of these drugs would have prevented his death.

113.     Finally, a simple administration of intravenous fluids would have prevented Tyler's death.

### *Tyler's death resulted from the standard operating procedure of both Adams County and Corizon.*

114.     As a part of the investigation into Tyler's death by the Adams County Sheriff's Office, Dr. Clower was interviewed. In his interview, Dr. Clower stated that, after reviewing Tyler's medical records, the nurses who treated Tyler had correctly and adequately followed the Corizon Opiate Withdrawal Protocol.

115.    Dr. Clower stated that Nurse Groothuis's decision to give Tyler Gatorade, instead of intravenous fluids, along with her decision not to contact Dr. Clower when Tyler's blood pressure reading was abnormally high at 2:30 a.m. on May 17, 2015, were the correct decisions and were in compliance with the Corizon opiate withdrawal protocol.

116.    Upon information and belief, no employee of Corizon has been disciplined in connection with Tyler's death.

117.    Sheriff Michael McIntosh is responsible for supervising all sergeants and deputies at ACDF, including those who watched as Tyler died from dehydration on May 17, 2015.

118.    Upon information and belief, no member of the Sheriff's Department of Adams County has been disciplined in connection with Tyler's death.

119.    The Adams County Sheriff's Office's investigation into Tyler's death did not render criminal charges.

120.    Adams County Defendants have ratified the actions of Corizon and its employees. Adams County Defendants have ratified the actions of the sergeant and deputies who stood by and offered no treatment as Tyler died.

***Corizon's nationwide custom, policy, and/or practice is to provide unconstitutional, deliberately indifferent care so as to cut costs and increase Corizon's profits.***

121.    Corizon is a for-profit, billion-dollar company that was formed in 2011 when its predecessor, Correctional Medical Services, Inc. ("CMS"), merged with PHS Correctional Healthcare ("PHS"). Under each of these names, Corizon has had a long and well-publicized history of sacrificing the health and lives of inmates for profit. Corizon, which operates in hundreds of correctional facilities in dozens of states, uses the same profit-maximizing approach nationwide: "[T]heir whole goal," one Arizona judge has observed, "is how not to do any work."

122.    At the time of Tyler's death, Corizon knew that its deliberate strategy of cutting costs by, among other things, understaffing facilities, inadequately screening and training employees, denying inmates physician consultations, failing to provide necessary medication and/or treatment, and denying patients access to needed acute care, placed those in its care at serious risk of grave illness and even death.

123.    These are the very customs, policies, and/or practices that killed Tyler. Tyler died because Corizon medical providers failed to administer prescribed medications; failed to prescribe the proper medications; failed to continue to administer medications that Tyler had been prescribed by his primary care physician; ignored his need for medical treatment for days, even as they witnessed his physical and mental deterioration and anguish; failed to provide even one consultation with his treating physician; and failed to summon emergency medical assistance when they observed his condition rapidly deteriorating, even when he was on the brink of death.

124.    The above-outlined Corizon policies are exemplified by the statements of one Corizon nurse to Tyler before his death: that Corizon's policy is to not provide intravenous fluids unless it's "absolutely necessary." Corizon emphasizes to its employees that patient care is be given less regard than profits. Corizon explicitly trains its employees to not provide care to inmates, so as to minimize care costs and increase the company's revenues.

125.    These are customary and known practices adopted and employed by Corizon so as to maximize profits. Such practices include, but are not limited to, inadequately staffing facilities; employing unqualified staff; failing to train and/or vet staff; delaying and/or denying life-saving care, even in emergency situations; and failing to prescribe medication, even when it is necessary.

126.    In 2012, the Eleventh Circuit affirmed a jury finding that Corizon pursues a policy of denying medical treatment to inmates, and even refusing to send prisoners on the brink of death to hospitals, in order to save money. In *Fields v. Corizon Health, Inc.*, 490 F. App'x 174 (11th Cir. 2012), the jury confirmed that this policy had caused the gruesome suffering and permanent paralysis of Brett Fields. Mr. Fields had complained of a severe bacterial infection for several weeks, but a PHS nurse refused to send him to the hospital and instead gave him Tylenol even as his legs began to twitch, he lost his ability to walk, and his intestines descended out of his rectum. The Eleventh Circuit affirmed the jury's finding that Mr. Fields's injuries resulted from PHS's policy of "delaying treatment to save money," which it "implemented... with deliberate indifference as to the policy's unknown or obvious consequences" for the company's patients. *Id.* at 184-85 (internal quotation marks and alterations omitted).

127.    Monitoring reports, state audits, and reviews of Corizon by states across the country reflect the same custom and policy of providing substandard care for the purpose of cutting costs.

128.    One hundred days after Florida brought in Corizon to provide care for a vast majority of its inmates, the monthly inmate death count rose to a ten-year high, while the number of critically ill prisoners sent for hospital treatment plummeted. Monitoring reports found, consistent with Corizon's treatment of Tyler, medical staff failed to make rounds, gave inmates medication without, or contrary to, the advice of doctors, and failed to transfer inmates who were suffering from dire health problems to acute care facilities.

129.    A February 2012 report of Corizon's performance in Idaho concluded that the company was deliberately indifferent to the medical needs of prisoners. Just like Corizon's response to Tyler's immediate medical needs, in Idaho, response to prisoners' requests for

medical attention were delayed, or their requests were entirely ignored; the same was true in emergency care situations, as inadequately trained staff were slow to respond. The Idaho report found Corizon staffing inadequate and incompetent, and that the mental healthcare provided by Corizon was deficient. Corizon's operations in Idaho failed 22 of 33 audit categories in 2010 and 26 of 33 categories in 2011.

130.    A 2014 report detailed failures of medical care by Corizon in Alabama prisons. It attributed multiple deaths and serious injuries to "extraordinary understaffing," which caused crises including the failure to monitor diabetic patients and slow or nonexistent emergency responses—the very same failed monitoring and lack of emergency care that caused Tyler's death.

131.    In a November 2011 audit of CMS's performance in Maine prisons, it was found that: 11% of sick calls were never or not timely resolved; staff was inadequately trained; and medications were routinely improperly administered. When Maine decided not to renew Corizon's contract in 2012 and they instead contracted with another healthcare provider, inmate complaints about their medical care significantly dropped.

132.    Physicians have refused to return inmates to Corizon's care, because Corizon customarily provides woefully inadequate care in an effort to increase profit margins. Debbie Daley was an inmate in Virginia who had been diagnosed with colorectal cancer. She was forced to wait eight months to see an outside physician because of delays by Corizon. When she finally made it to see outside physicians at the University of Virginia, she was febrile, septic, and in great pain due to a cancer-related infection. Ms. Daley's doctor was so concerned about this medical neglect that she called the University of Virginia Ethics Consult Service for guidance,

and refused to discharge Ms. Daley back to Corizon without an agreement that they would provide constitutional and prompt quality services to Ms. Daley.

133.    Lawsuits throughout the country, in Alabama, Arizona, California, Florida, Idaho, Indiana, Iowa, Louisiana, Maine, Minnesota, Missouri, New Mexico, and New York, among other states, detail what one D.C. municipal lawmaker identified in 2015 as Corizon's "deeply troubling track record of human rights abuses." According to one Florida newspaper, Corizon was sued at least 660 times for malpractice from 2008-2013. A more recent survey counts 1,300 such lawsuits in those five years.

*Corizon, nationwide, has a custom, policy, or practice of refusing to provide inmates, regardless of their medical condition, with physician consultations.*

134.    Corizon customarily delays treatment by physicians, and specialists, to keep healthcare costs down, at the expense of inmates' lives.

135.    A 2014 investigation by the Palm Beach Post revealed that numerous Florida prisoners who had obvious end-stage cancer symptoms had those symptoms disregarded by Corizon employees. One of those prisoners, Jovon Frazier, complained for months of persistent and increasing pain in his left shoulder. Mr. Frazier, like Tyler, was never allowed to see a doctor, only nurses, and those nurses refused to provide treatment other than giving him Tylenol. When Mr. Frazier was finally taken to the hospital, a cancerous mass was found in his left shoulder. Mr. Frazier ultimately lost his left arm and, a little while later, his life.

136.    In September 2013, Louisiana canceled its contract with Corizon, and six Corizon employees subsequently resigned in light of seven health-care related deaths that occurred in the state's prisons over seven months in 2012. At least three of the deaths were preventable. One, in particular, bears chilling similarities to Tyler's death. On August 8, 2012, Samantha George, a severe diabetic also suffering from a bacterial infection, died after complaining of fever and pain.

While Ms. George lay in her cell partially naked and unresponsive, Corizon staff repeatedly

peered into her cell but did nothing to assist her. The only doctor on duty was off-site and told

the nurse who contacted him that he would examine Ms. George the following day. By then, Ms.

George was dead.

137.    Corizon's pattern of delayed or denied medical care killed at least nine additional

people and caused serious or critical injuries to twenty-one others in Minnesota before the state

cancelled its contract with Corizon in 2013. A 2014 audit of Corizon's performance in

Minnesota found that the deaths and injuries were in large part attributable to inadequate

staffing. In order to cut costs, on weekdays after 4:00 p.m. and on weekends, Corizon paid a

single doctor to be on call for the entire state prison system.

138.    According to published accounts, one Minnesota victim of this policy was Xavius

Scullark-Johnson. In May 2013, Mr. Scullark-Johnson suffered seven seizures in his cell, where

he was left for nearly eight hours with no care. He was found soaked in urine on the floor of his

cell, but still no ambulance was called for several more hours. When the ambulance finally

arrived, a Corizon nurse turned it away because allowing Mr. Scullark-Johnson to travel by

ambulance to a hospital would have violated Corizon protocols designed to cut costs. Without

access to hospital care, Mr. Scullark-Johnson soon died.

139.    In another disturbing case that illustrates Corizon's custom, policy, or practice of

not allowing inmates to see a treating physician, even when they are experiencing medical

emergencies, an inmate in Michigan who was diagnosed with cardiovascular problems and

manic-depressive disorder was experiencing psychosis when he was shackled to a table by his

arms and legs in 4-point restraints. He was left shackled and naked in a 106 degree cell for four

days, all the while Corizon staff knew he was being held this way in isolation. Even though

Corizon staff knew he was having a medical emergency, the inmate, like Tyler, was never seen by a physician. He died four days later.

140.     Corizon's custom, policy, or practice of refusing to provide critically ill inmates with physician consultations is illustrated by another case where an inmate with a swollen "open wound" on his testicle from a MRSA infection, like Tyler, was never seen by a physician throughout his incarceration. In fact, the inmate did not even have his critical vital signs monitored or receive a personal physical examination from a nurse. Because of this denial of medical care, the inmate, Andre Ward, developed bilateral pneumonia. Only after he developed this extremely serious medical condition was he admitted to the hospital. Mr. Ward died fourteen days later.

*Corizon, nationwide, has a custom, policy, or practice of refusing to provide necessary medication and/or treatment.*

141.     Corizon customarily consciously denies medication or provides nonprescription treatment, to keep healthcare costs down, at the expense of inmates' lives.

142.     A 2015 investigation at Florida Women's Reception Center in Ocala, Florida, found that a woman with diabetes had gone almost three months without insulin, and mentally ill inmates were inexplicably taken off their prescribed psychiatric medications. Consistent with these Florida inmates, Tyler was inexplicably taken off his prescribed psychiatric medication without alternative treatment.

143.     In Arizona, Corizon medical providers refused to provide any prenatal care to a pregnant inmate because it was not cost-effective. After the inmate gave birth via cesarean section, Corizon medical staff closed the wound not by stitching it shut, but by placing butterfly bandages on it. The inmate's wound was soon infected and instead of sending her straight to the hospital, Corizon delayed treatment. Ultimately, the inmate was sent to the Corizon-run prison

hospital where her wound was *packed with sugar from the prison kitchen*. This occurred for over three weeks.

144.    In a case that resulted in the largest wrongful death civil rights settlement in California state history, Corizon and Alameda County agreed to pay $8.3 million dollars to the surviving children of Martin Harrison, an inmate who died in Alameda County jail. Mr. Harrison was not given any treatment for his alcohol withdrawal and went into extreme delirium tremens. While suffering from this medical emergency, he began to have hallucinations and was tased and beaten by deputies at the jail. Mr. Harrison eventually died.

145.    PHS, which was acquired by Corizon, told nurses at a Florida prison that only doctors could make the decision to send an inmate to the hospital and that they could not send an inmate to the hospital unless "you can see that they're dying any minute." PHS set this policy into place because "foolish" emergency trips "cost... so much money." As a result, when an inmate's intestines fell out of his rectum and his legs went numb, the nurse ordered Tylenol and manually pushed the inmate's intestines back into his body. The inmate, Brett Fields, was forced to wait three days to go to the hospital. He was left partially paralyzed in both legs. The parallels to Tyler's case are obvious, as Tyler was told by Corizon medical staff that they do not use intravenous fluids unless it's "absolutely necessary." This purposeful withholding of necessary medical care is done solely to increase profits, at the expense of providing constitutionally adequate medical care.

**Corizon, nationwide, has a custom, policy, or practice of refusing to send inmates with emergency medical needs to the hospital, acute care facility, or other off-site emergency care provider.**

29

146.     Corizon customarily refuses to transport inmates to life-saving and necessary emergency medical services, so as to keep healthcare costs down at the expense of inmates' lives.

147.     In October 2013, a report in Arizona detailed cases of Corizon's neglect and mistreatment of inmates. In surveys, Corizon nurses in Arizona confirmed the contents of the report and related that patients were deprived of urgent medical care because facilities were understaffed and the limited medical personnel who were available were inadequately trained.

148.     In March 2015, the Minnesota Department of Corrections agreed to pay hundreds of thousands of dollars to settle the wrongful death claim of an inmate whose pleas for emergency care were repeatedly ignored by officers and medical staff at a correctional facility. Corizon separately settled with the family and paid an undisclosed amount. The inmate, Jerrell Hammond, had begged corrections officers for help as he suffered from pulmonary blood clots. Prison records showed that Corizon medical staff knew that Mr. Hammond's breathing was worsening for two weeks up to his death and only prescribed him Tylenol. In the hours leading up to his death, Corizon's on-call doctor refused to order Mr. Hammond to be transferred to a hospital emergency room. Like Tyler, Mr. Hammond would die shortly after his pleas for help went unanswered.

***Corizon, nationwide, has a custom, policy, or practice of providing deliberately indifferent medical care to inmates suffering from withdrawal from opiates and/or benzodiazepines.***

149.     Corizon's record of failing to provide inmates in withdrawal with even the most basic of medical services is vast and well-documented.

150.     In a case that is remarkably similar to Tyler's, an inmate who was withdrawing from heroin in a Louisville jail where Corizon provided medical services died from a lack of

care. In that case, the City of Louisville settled with the family of the inmate for $160,000 and Corizon settled for an undisclosed amount. In the wake of the settlement, the director of the Louisville Metro Department of Corrections acknowledged that Corizon, the company contracted to provide inmate health care, was ill-prepared to handle the heroin epidemic that exploded in early 2012.

151.    In another case similar to Tyler's, an inmate died in the St. Louis Justice Center due to heroin withdrawal. Corizon, per its usual practice, agreed to pay a confidential amount to the family of the inmate. The inmate suffered withdrawal symptoms, including vomiting and diarrhea, and despite those symptoms he would not be given basic treatment, including intravenous fluids. The inmate would die two days later. *See Youell v. Correctional Medical Services*, Case No. 4:10-cv-001180-TIA (E.D. Mo. 2010).

152.    Another inmate under Corizon's care in the St. Louis Justice Center, Isaac Bennett, died due to complications from heroin withdrawal. Mr. Bennett died only two days after entering the jail, a period of 48 hours in which he experienced diarrhea and vomiting. Despite those obvious symptoms, Mr. Bennett was not given even the most basic medical treatment. Again, Corizon agreed to pay a confidential amount to the family in exchange for settlement.

153.    In yet another case involving an inmate who died in a "detoxification setting," Corizon medical staff deprived an inmate of her antipsychotic medications and ignored her until she committed suicide. The family of the inmate reached a confidential settlement with Corizon. *Grabow v. Cnty. Of Macomb*, No. 12-10105 (E.D. Mich.).

154.    Under Corizon's care, an inmate in the Volusia County Jail, Tracy Lee Veria, died from complications of opiate withdrawal. Similar to Tyler, when Ms. Veira entered the jail she told officials that she had been taking Oxycodone every day. The Corizon medical staff,

however, did nothing with this information. Corizon medical staff did not speak to Ms. Veira's former doctor or her outside pharmacy, did not make plans to continue her medication, and did not order any follow-up care. By her seventh night in jail, Ms. Veira was violently ill and screaming out to jail staff for help. She would be ignored and die a few days later in her cell.

155. Corizon had all of the above-described knowledge and notice prior to Tyler's deliberately indifferent treatment and injuries, which were the result of longstanding, systemic deficiencies in the medical care provided to inmates by Corizon, as well as the widespread company policies of (1) refusing to provide inmates, regardless of their medical conditions, with physician consultations; (2) refusing to provide inmates with necessary medication and/or treatment; (3) refusing to send inmates with emergency medical needs to the hospital or other off-site providers; and (4) providing deliberately indifferent medical care to inmates suffering from withdrawal.

156. Upon information and belief, Corizon has not: disciplined any of the nurses or Doctor Clower for their conduct that resulted in Tyler's death; provided further training to their employees after Tyler's death; and/or terminated any of the nurses or Doctor Clower for their conduct that resulted in Tyler's death. Corizon ratified the constitutional violation by the individual Defendants by failing to administer any discipline or to take appropriate corrective or remedial action. This is Corizon's custom, policy or practice, as they never dole out discipline to their employees who provide unconstitutional care. Corizon employees know that they will not face discipline for providing inadequate care so as to cut costs.

***Adams County Defendants contracted with Corizon knowing of its custom, policy, and practice of providing unconstitutional, deliberately indifferent care so as to cut costs and increase its profits.***

157.     That Corizon routinely prioritizes cost-cutting over basic, adequate medical care to inmates has been well-documented. Adams County Defendants knew or should have known of Corizon's deliberate strategy of cutting costs by, among other things, understaffing facilities, inadequately screening and training employees, denying inmates access to physician consultations, failing to provide necessary medication and/or treatment, and denying inmates access to needed acute care, placed those in its care at serious risk of grave illness and even death, but they disregarded the wellbeing of the individuals in their custody, with fatal consequences for Tyler among others.

158.     At the time of Tyler's death, as Adams County Defendants knew or should have known, Corizon medical and healthcare providers nationwide routinely failed to conduct adequate rounds or clinical examinations of their patients, routinely denied patients access to needed doctors and medication, routinely denied inmates necessary transfer to hospital and acute care facilities to meet their emergency medical needs, and failed to follow basic, minimal clinical guidelines for inmates withdrawing from opiates and/or benzodiazepines, all of which placed the health and lives of Corizon's patients at risk.

159.     As Adams County Defendants were contracting with Corizon to care for Tyler and his fellow inmates, other states were cancelling their contracts with Corizon one by one, as they faced the suffering and deaths that Corizon's cost-cutting measures produced. Corizon lost contracts with state prisons in Vermont (2005), Alabama (2007), and Delaware (2010), and with county jails in Galveston County, Texas (2007), Pima County, Arizona (2008), Monroe County, New York (2010), Allegheny County, Pennsylvania (2015), Riker's Island, New York City (2015), and Louisville, Kentucky (2015), almost always following allegations by officials that the company was not providing adequate healthcare. Between 2012 and 2015, Corizon also lost

contracts with Minnesota, Maine, Maryland, Tennessee, and Pennsylvania. These contract terminations were followed by others in: New Mexico; Florida; Washington, D.C.; Volusia County, Florida; El Paso, Texas; Chatham County, Georgia; and Santa Barbara County, California, among other jurisdictions.

160.     It was well-established by 2015 that Corizon was customarily and routinely failing to provide care to inmates that met constitutional standards across the country. Adams County Defendants knew, or should have known, of Corizon's systematic failure to provide care rising above deliberate indifference to inmates' serious medical needs. In the face of all of this information, Adams County Defendants opted to contract with Corizon to continue to provide medical services to inmates at ACDF.

161.     Adams County Defendants had all of the above-described knowledge and notice prior to Tyler's deliberately indifferent treatment and injuries, which were the result of longstanding, systemic deficiencies in the medical care provided to inmates by Corizon, as well as the widespread company policies of: (1) refusing to provide inmates, regardless of their medical conditions, with physician consultations; (2) refusing to provide inmates with necessary medication and/or treatment; (3) refusing to send inmates with emergency medical needs to the hospital or other off-site providers; and (4) providing deliberately indifferent medical care to inmates suffering from withdrawal.

162.     Adams County Defendants have a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees.

***Adams County Defendants have a custom, policy, or practice of providing inadequate medical care to inmates, particularly those suffering withdrawal from opioids.***

163.     In 2011, Bernadette Jaquez died in the Adams County Detention Facility from dehydration connected to withdrawal from opioids. The parallels to the deliberate indifference

shown toward Tyler are stark. Upon intake, Ms. Jaquez informed medical staff and Adams County deputies that she was a heroin user. Within days of entering ACDF, Ms. Jaquez began to experience symptoms of withdrawal. She soon suffered a seizure in her cell, which was attributed in jail records to her withdrawal. Also noted in her records was her consistent vomiting and diarrhea. Ms. Jaquez was taken to the hospital, but returned to ACDF after only two hours. Upon her return to ACDF, Ms. Jaquez repeatedly asked correctional and medical staff for help. They ignored her. She pressed the distress button in her cell at least fifteen times on the day she died. The final time she pressed the distress button, two deputies came to her cell door. As they watched Ms. Jaquez, she wobbled and fell to the floor. Instead of entering the cell to check on Ms. Jaquez, the deputies walked away. Two hours later, Ms. Jaquez was dead. PHS settled with the surviving family members of Ms. Jaquez and admitted liability for her death.

164.    At the time of Ms. Jaquez's death, PHS, a company that was absorbed by Corizon, was providing healthcare services at ACDF. After Ms. Jaquez's death, Adams County Defendants did not change healthcare providers or otherwise sanction PHS. Corizon, which absorbed PHS, was providing medical services to inmates at ACDF at the time of Tyler's death.

165.    Upon information and belief, since the death of Ms. Jaquez, Adams County Defendants have not changed their customs, policies, or practices so as to adequately train staff to recognize the effects of dehydration connected to withdrawal from opiates.

166.    Upon information and belief, Adams County Defendants do not adequately train staff to recognize the effects of dehydration connected to withdrawal from opiates or the symptoms of opiate withdrawal generally.

167.    Upon information and belief, Adams County Defendants do not adequately train staff to recognize the effects of dehydration connected to withdrawal from benzodiazepines or

the symptoms of benzodiazepine withdrawal generally.

168.     After the death of Tyler, the Adams County District Attorney, Dave Young, investigated the death of Tyler. Mr. Young's office found that no corrections or medical staff member at ACDF committed a criminal offense in connection with Tyler's death.

169.     Upon information and belief, Adams County Defendants ratified the violation of Tyler's constitutional rights by the individual Defendants, and by Corizon, in their failure to administer any discipline or to take appropriate corrective or remedial action. This is the custom, policy or practice of Adams County Defendants. Employees of Adams County Defendants know that if they provide unconstitutional care, they will not face consequences, disciplinary or otherwise.

170.     Tyler's death at ACDF was one of four in a span of only three months. Three of the men committed suicide after being given inadequate mental health care and a lack of any supervision whatsoever. Tyler died from ACDF officials' deliberate indifference to his serious medical needs, as they ignored Tyler's obvious signs of dehydration until he died. The inmate death rate at ACDF by suicide or medical emergency is 25 times that of Denver in the past four years. There is clearly a custom, policy, or practice by Adams County Defendants of ignoring inmates' serious medical needs, whether they are physical or mental health related.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment - Failure to Provide Medical Care and Treatment**
**(Against All Defendants)**

171.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth therein.

172.     At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

173.     Tyler Tabor was a citizen of the United States and all of the individual Defendants are persons under 42 U.S.C. § 1983.

174.     Tyler Tabor had a clearly established right under the Fourteenth Amendment to the United States Constitution to be free from deliberate indifference to his known serious medical needs.

175.     Each individual Defendant knew or should have known of this clearly established right at the time of Tyler Tabor's death.

176.     At all times relevant to the allegations in this Complaint, each individual Defendant knew of and disregarded the excessive risks associated with Tyler Tabor's serious and life-threatening medical condition.

177.     Nevertheless, with deliberate indifference to Tyler Tabor's constitutional right to adequate medical care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants knowingly failed to examine, treat, and/or care for Tyler Tabor's worsening condition.  They did so despite their knowledge of Tyler Tabor's serious medical needs, thereby placing him at risk of serious physical harm, including death. Therefore, Defendants knew or were aware that Tyler Tabor faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

178.     When Tyler Tabor, and others acting on his behalf, alerted each individual Defendant to his need for medical assistance, Defendants acted with deliberate indifference to Tyler Tabor's readily apparent need for medical attention and his constitutional rights by refusing to obtain and provide any medical treatment for him.

179.     All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

180.    The acts or omissions of each individual Defendant were the legal and proximate cause of Tyler Tabor's death.

181.    The acts and omissions of each individual Defendant caused Tyler Tabor damages in that he suffered extreme physical and mental pain while he was in Defendants' custody.

182.    The intentional actions or inactions of each individual Defendant as described herein intentionally deprived Tyler Tabor of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

### SECOND CLAIM FOR RELIEF[1]
### 42 U.S.C. § 1983
### Fourteenth Amendment – Municipal Liability
### (Against Adams County Defendants and Corizon)

183.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

184.    Adams County Defendants and Corizon are persons within the meaning of 42 U.S.C. § 1983.

185.    At all times relevant to the allegations in this Complaint, Adams County Defendants were acting under color of state law and had a non-delegable duty to provide constitutionality adequate medical care for inmates.

---

[1] Plaintiffs intend to argue that the 10th Circuit case *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005), was wrongly decided and that respondeat superior should apply to private entities, such as Corizon, in § 1983 actions. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 795 (7th Cir. 2014) ("For all of these reasons, a new approach may be needed for whether corporations should be insulated from respondeat superior liability under § 1983. Since prisons and prison medical services are increasingly being contracted out to private parties, reducing private employers' incentives to prevent their employees from violating inmates' constitutional rights raises serious concerns. Nothing in the Supreme Court's jurisprudence or the relevant circuit court decisions provides a sufficiently compelling reason to disregard the important policy considerations underpinning the doctrine of respondeat superior. And in a world of increasingly privatized state services, the doctrine could help to protect people from tortious deprivations of their constitutional right."). In any event, all the institutional Defendants in this matter are legally culpable whichever standard of institutional liability is applied.

186.     At all times relevant hereto Corizon was willfully a participant in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical care to inmates.

187.     The intentional acts or omissions of Adams County Defendants and Corizon were conducted within the scope of their official duties and employment.

188.     Corizon's and Adams County Defendants' deliberately indifferent and unconstitutional policies, customs, and/or practices regarding opiate withdrawal and provision of constitutionally adequate medical care as described were the moving and proximate cause of Tyler Tabor's injuries and death.

189.     Corizon and Adams County Defendants deliberately indifferently failed to properly train and supervise their employees to provide necessary medical care to detainees at ACDF.

190.     The failures in training, supervision, and policy regarding providing necessary medical assessment and care were so obvious that the failure to provide medical assessment and care was deliberately indifferent to the rights of Tyler Tabor, Plaintiffs, and the public.

191.     Corizon's and Adams County Defendants' deliberately indifferent customs, and failures to train/supervise, are all actionable policy decisions that were moving forces and proximate causes of the violation of Tyler Tabor's constitutional rights.

192.     The policies, customs, and practices of Corizon and Adams County Defendants as described herein were also moving forces in and proximate causes of the deprivation of Tyler Tabor's right to due process and of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiffs other damages.

193.     Adams County Defendants are also directly liable for their own policies and

39

actions that are moving forces in this constitutional injury under the contract between Adams County and Corizon, as Adams County and Sheriff Michael McIntosh participated in negotiating and sponsoring this contract despite the knowledge of Corizon's pervasive pattern of civil rights and human rights violations.

### THIRD CLAIM FOR RELIEF
### § 1983 – Supervisory Liability for Failure to Train and Supervise
### (Against Sheriff Michael McIntosh and Mykelann Wise ("Supervisory Jail Defendants"))

194.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

195.    The Supervisory Jail Defendants each have duties to train and supervise deputy sheriffs, nurses and other jail personnel in order to ensure the safety and well-being of detainees in ACDF.

196.    Each of the Supervisory Jail Defendants failed to discharge these duties.

197.    The Supervisory Jail Defendants acted intentionally in failing to adequately train and supervise deputy sheriffs, nurses and other jail personnel.

198.    The Supervisory Jail Defendants' failure to properly train and supervise their subordinate employees was the moving force and proximate cause of the violation of Tyler Tabor's constitutional rights.

199.    The acts or omissions of the Supervisory Jail Defendants caused Tyler Tabor damages in that he suffered extreme physical and mental pain during the approximately seventy-two hours leading up to his death and ultimately caused his death.

200.    The actions and inactions of the Supervisory Jail Defendants as described herein deprived Tyler Tabor of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused her other damages.

## FOURTH CLAIM FOR RELIEF
### First and Fourteenth Amendments – Deprivation of Familial Association
### (On Behalf of Plaintiffs Ray Tabor, Michelle McLean, D.T., and Bridget Tabor, Against All Defendants)

201.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

202.   Plaintiffs Ray Tabor, Michelle McLean, D.T., and Bridget Tabor had a clearly established right to not be deprived of their liberty interest in their intimate familial association with their son, father, and husband, respectively, Tyler Tabor, at the time of the events described herein.  The constitutional right to family integrity or association protects family relationships.

203.   Plaintiffs' liberty interest and right of familial association outweighed any state interest in depriving them of such right of intimate association under the facts and circumstances of this case.

204.   Defendants' conduct as described herein, in intentionally engaging in the conduct that led to the death of Tyler Tabor, deprived Plaintiffs of their liberty interest in their intimate association with Tyler Tabor as protected under the First and Fourteenth Amendments to the United States Constitution.

205.   Defendants' conduct was engaged in maliciously or in reckless disregard of Plaintiffs' federally protected rights to intimate familial association.

206.   Defendants' conduct proximately caused significant injuries, damages and losses to Plaintiffs.

207.   Defendants' conduct as described throughout this Amended Complaint deprived all Plaintiffs of their clearly established constitutional rights of which reasonable persons in Defendants' position knew or should have known.

## FIFTH CLAIM FOR RELIEF

41

**42 U.S.C. § 1983**
**Fourteenth Amendment - Deprivation of Life without Due Process**
**(Against All Defendants)**

208.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

209.     All Defendants to this claim, at all times relevant hereto, were acting under the

color of state law.

210.     At the time of Tyler Tabor's death, Tyler Tabor had a clearly established

constitutional right under the Fourteenth Amendment to the United States Constitution to not be

deprived of his life without due process of law.

211.     The acts and omissions of the individual Defendants were the moving force

behind and proximate cause of Tyler Tabor's death without due process of law.

212.     The acts and omissions of Corizon and Adams County Defendants deprived Tyler

Tabor of the rights, privileges, liberties and immunities secured by the United States Constitution

and caused Tyler Tabor other damages.

213.     The acts and omissions in which Defendants were engaged were pursuant to the

customs, policies, and practices of Corizon and Adams County Defendants, which encourage,

condone, tolerate, and ratify deliberate indifference to the serious medical needs of inmates by

those acting under the color of state law, and the right to not be deprived of life without due

process. Those customs, policies, and practices were moving forces and proximate causes of

Tyler Tabor's death and all related damages.

**SIXTH CLAIM FOR RELIEF**
**Medical Negligence Causing Wrongful Death**
**(Against Corizon, Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and**
**Cheryl Groothuis)**

214.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

42

forth herein.

215.     Corizon is a private corporation that contracts with Adams County Defendants to provide medical care and health services to inmates.

216.     Defendants Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis are private individuals, and not public officials or employees.

217.     Corizon, Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis are not entitled to any immunity under the Colorado Governmental Immunity Act ("CGIA") or otherwise.

218.     Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis are agents of Corizon and their conduct as described herein was engaged in within the scope of their agency.

219.     At all times relevant to this action, Tyler Tabor was under the medical responsibility, care, and treatment of Corizon, Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis.

220.     Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, Cheryl Groothuis and other care providers had a duty to provide reasonable medical care and treatment to detainees at ACDF, including Tyler Tabor.

221.     Corizon had the duty to exercise reasonable care in the training and supervision of its employees.

222.     These duties of care are informed by state law.  For example, under C.R.S. § 16-3-401, "persons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation and/or is guaranteed by other legal obligation.

Defendants also had a common law obligation to provide Tyler Tabor with adequate medical treatment and humane care.

223.    Through their actions and omissions, Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, Cheryl Groothuis, and other care providers breached their duty of care when they knowingly failed to assess, monitor, treat and care for Tyler Tabor, despite the fact that he was in obvious need of immediate medical attention.

224.    Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis had nurse-patient relationships with Tyler Tabor and Benjamin Clower had a doctor-patient relationship with Tyler Tabor at all relevant times and Defendants were acting within the scope of their employment throughout the duration of these relationships.

225.    With respect to their care and treatment of Tyler Tabor, Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis owed Tyler Tabor a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.  Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis breached that standard of care and were negligent in failing to properly assess, monitor, treat, and care for Tyler Tabor.

226.    As a direct and proximate result of Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis having breached their duty to provide reasonable medical care and treatment to Tyler Tabor, he suffered significant physical and mental pain and suffering, and other damages, and ultimately died as a result.

227.    Corizon is vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for their own negligent failures in training, policies, and practices.

228.    Corizon is also directly liable because they breached their duty to exercise reasonable care in the training and supervision of their employees and agents in a manner that provided the detainees under their care with reasonable medical care and treatment.

229.    Corizon knew or should have known that the lack of supervision, experience, and training among their employees and agents was likely to harm ACDF detainees in need of medical care, including Tyler Tabor.

230.    In failing to exercise reasonable care in the training and supervision of their employees and agents, as it relates to their providing reasonable medical care and treatment, Corizon was negligent and proximately caused Tyler Tabor's death.

231.    The negligent acts and omissions by these Defendants were a substantial and significant contributing proximate cause of Tyler Tabor's death.

232.    As a result of the complained of negligence, Plaintiffs hereto have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, *inter alia*, pain and suffering, upset, grief, loss of society and companionship, anger, depression, and all other purely non-economic damages as allowed.

233.    D.T. and Bridget Tabor suffered and continue to suffer economic and non-economic damages due to Defendants' negligent conduct toward their father and husband, respectively, including, but not limited to, funeral expenses and financial losses due to the death of Tyler Tabor, and non-economic damages for grief, loss of companionship, impairment in the quality of life, inconvenience, pain and suffering, and extreme emotional distress. Plaintiffs hereto are therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages.

234.    Defendants' conduct was attended by circumstances of malice, or willful and

wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regards to the consequences to Tyler Tabor and the Plaintiffs.

235.     Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

## SEVENTH CLAIM FOR RELIEF
### Wrongful Death pursuant to C.R.S. § 13-21-202
**(Plaintiffs D.T. and Bridget Tabor, Against Corizon, Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis)**

236.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

237.     The doctor and nurses at ACDF, at all times relevant hereto, were employees of Corizon.

238.     Corizon is legally responsible to claimants for any harm caused by employees acting on their behalf.

239.     Corizon, Benjamin Clower, Duffy Sturgeon, Staci Gordon, Stephanie Ostrom, and Cheryl Groothuis are not entitled to any immunity under the Colorado Governmental Immunity Act ("CGIA") or otherwise.

240.     Plaintiffs, as the son and wife of Tyler Tabor, suffered and continue to suffer economic and non-economic damages due to Defendants' conduct toward their father and/or husband, including but not limited to economic damages for funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from their father and/or husband had he lived, and non-economic damages for grief, loss of their father's and/or husband's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

241.    Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, and that was done heedlessly and recklessly, without regard to the consequences to Tyler Tabor and his son and wife.

242.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.

243.    Defendants' conduct constituted a felonious killing under C.R.S. §§ 13-21-203 and 15-11-803, such that there shall be no statutory limitation on damages available herein to Plaintiffs.

## EIGHTH CLAIM FOR RELIEF
### Survival
### (Against all Defendants)

244.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

245.    Plaintiffs are the heirs of the Estate of Tyler Tabor.

246.    As a result of the deliberate indifference and/or negligence of Defendants as described above, Tyler Tabor and Plaintiffs have suffered injuries and damages, including, but not limited, to funeral expenses, emotional distress and pain and suffering, and loss of enjoyment of life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant:

(a)    Appropriate relief at law and equity;

(b)    Declaratory relief and other appropriate equitable relief;

(c)     Economic losses on all claims allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional

distress, humiliation, loss of enjoyment of life, and other pain and suffering on all

claims allowed by law in an amount to be determined at trial;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined

at trial;

(f)     Attorneys' fees and the costs associated with this action, including expert witness

fees, on all claims allowed by law;

(g)     Pre- and post-judgment interest at the highest lawful rate;

(h)     Any further relief that this Court deems just and proper, and any other relief as

allowed by law.

PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Dated this 22nd day of June, 2016.

KILLMER, LANE & NEWMAN, LLP

_s/ Andy McNulty_____
David A. Lane
Darold W. Killmer
Andy McNulty
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
(303) 571-1000
(303) 571-1001
dlane@kln-law.com
dkillmer@kln-law.com
amcnulty@kln-law.com

ATTORNEYS FOR PLAINTIFFS